UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| FREEEATS.COM, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-1403-LJM-WTL |
| | ) | |
| STATE OF INDIANA EX REL. STEVE | ) | |
| CARTER, ATTORNEY GENERAL and | ) | |
| STEVE CARTER, ATTORNEY GENERAL, | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

This cause is before the Court on the following motions:  Defendants', State of Indiana ex

rel. Steve Carter, Attorney General and Steve Carter, Attorney General ("the State" or "Indiana"),

Motion to Stay and Motion to Dismiss, and Plaintiff's, FreeEats.com, Inc. ("FreeEats"), Motion for

Preliminary Injunction.[1]  FreeEats is seeking declaratory and injunctive relief, specifically a

declaration that Indiana's statute regulating automatic dialing machines is void and an injunction

preventing Indiana from enforcing this law against out-of-state callers who wish to contact Indiana

residents.  The Court heard argument on the motions at an evidentiary hearing held on October 6,

2006, and ordered further briefing.  The motions are now fully briefed and ripe for ruling.

For the reasons stated herein, the Court **DENIES** the State's Motion to Stay, **DENIES** the

State's Motion to Dismiss, and **DENIES** FreeEats' Motion for Preliminary Injunction.

---

[1]  FreeEats has also filed a Motion for Partial Summary Judgment, which is not yet fully
briefed.  While this Order does not address the Motion for Partial Summary Judgment, some of
the Court's rulings in this Order will no doubt have an impact on the Court's decision on that
motion.

## I. LEGISLATIVE BACKGROUND

In 1934, Congress passed the Federal Communications Act ("FCA").  *See* 47 U.S.C. § 151

*et seq.*  The FCA "establishes, among other things, a system of dual state and federal regulation over

telephone service . . . ."  *La. Pub. Serv. Comm'n v. Fed. Commc'n Comm'n*, 476 U.S. 355, 360

(1986).  Sections 151 and 152 of the FCA "define a national goal of the creation of a rapid and

efficient phone service to enact a *dual* regulatory system to achieve that goal."  *Id.* at 370 (emphasis

in original).  Section 152(a) commits to the Federal Communications Commission ("FCC") the

ability to govern interstate telecommunications and, subject to certain exceptions, commits to the

States the ability to regulate intrastate telecommunication.  However, as the Supreme Court has

observed, "while the [FCA] would seem to divide the world of domestic telephone service neatly

into two hemispheres--one comprised of interstate service, over which the FCC would have plenary

authority, and the other made up of intrastate service, over which the State would retain exclusive

jurisdiction--in practice, the realities of technology and economics belie such a clean parceling of

responsibility."  *La. Pub. Serv. Comm'n*, 476 U.S. at 360.

In 1991, Congress added the Telephone Consumer Protection Act ("TCPA") to the FCA, in

part due to the large volume of complaints from citizens to the FCC regarding telemarketing

practices that were evading state prohibitions via interstate operation.  *See* Pub. L. No. 102-243, §

2, 105 Stat. 2394, 2394-95; S. Rep. No. 102-178 (1991), reprinted in 1991 U.S.C.C.A.N. 1968,

1968-70.  The TCPA makes it unlawful "to initiate any telephone call to any residential telephone

line using an artificial or prerecorded voice to deliver a message without the prior express consent

of the party called, unless the call is initiated for emergency purposes or is exempted by rule or order

by the [FCC] under paragraph (2)(B)."  47 U.S.C. § 227(b)(1)(B).  The TCPA contains a savings

2

clause discussing the effect on state law.  Specifically, the savings clause provides that "nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulation on, or which prohibits-- . . . the use of automatic dialing systems . . . ."  47 U.S.C. § 227(e)(1)(B).  As the Senate Report accompanying the bill suggests, the TCPA was intended to supplement State regulations and set a minimum level necessary to protect the public's privacy, safety, and commerce concerns while permitting the States to enact more restrictive measures on automatic dialing systems and artificial or prerecorded voice messages.  *See* S. Rep. No. 102-178 (1991), reprinted in 1991 U.S.C.C.A.N. 1968 at 1970, 1973, 1978.

In 1992, the FCC exercised its authority granted by Congress under section 227(b)(2)(B) and adopted a rule to exempt all prerecorded calls made for a noncommercial purpose.  *See* 47 C.F.R. § 64.1200(a)(2)(ii).  In creating the exemption, the FCC stated that "[w]e find that the exemption, for non-commercial calls from the prohibition on prerecorded messages to residences includes calls conducting research, market surveys, political polling or similar activities which do not involve solicitation as defined by our rules."   Rules and Regulations Implementing the Tel. Consumer Protection Act of 1991, Rep. and Order, 7 FCC Rcd. 8752 (1992), ¶ 41.  The FCC has opined that "any state regulation of interstate telemarketing calls that differs from our rules almost certainly would conflict with and frustrate the federal scheme and almost certainly would be preempted." Rules and Regulations Implementing the Tel. Consumer Protection Act of 1991, Rep. and Order, 18 FCC Rcd. 14014 (2003), ¶ 84.

In 1988, prior to the passage of the TCPA or 47 C.F.R. § 64.1200, Indiana enacted its own statutory regulations pertaining to automatic dialing machines.  *See* Pub. L. No. 151-1988, § 1, 1988

3

Ind. Acts 1868.  The statutory section relevant to this case provides that "a caller may not use or connect to a telephone line an automatic dialing-announcing device unless: (1) the subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message; or (2) the message is immediately preceded by a live operator who obtain the subscriber's consent before the message is delivered."  Ind. Code § 24-5-14-5(b) ("the Automated Dialing Machine Statute" or "the ADMS").  This section excludes from coverage certain entities with whom the recipient of a call has a prior or existing relationship, but unlike the FCC's regulation it does not contain a broad exclusion exempting any non-commercial call.  *See* Ind. Code § 24-5-14-5(a).[2]

## II. <u>FACTUAL BACKGROUND</u>

FreeEats is incorporated in Virginia and is a survey and database company that uses prerecorded telephonic messages to poll households, identify political supporters, deliver political advocacy messages, and encourage supporters to go to the polls to vote for candidates.  *Decl. of Gabriel S. Joseph, III*, ¶¶ 2-4; *Second Decl. of Gabriel S. Joseph, III*, ¶¶ 2-6, 11.  FreeEats makes interstate calls into all fifty states.  *Third Decl. of Gabriel S. Joseph, III*, ¶ 2.  For all non-live answers, FreeEats will attempt to call a number up to three times.  *Second Decl. of Gabriel S. Joseph, III*, ¶ 13.

FreeEats filed its Complaint seeking declaratory and injunctive relief on September 21, 2006. At the time that FreeEats filed its Complaint, the State was in the process of enforcing the ADMS

---

[2]  The Court notes that Indiana's statutory scheme also provides for somewhat different restrictions on telephone solicitation than the FCC's rule, such as time restrictions.  *See*, *e.g.*, Ind. Code § 24-5-14-8 and 47 C.F.R. § 64.1200(c)(1).  However, those differences are not at issue in this case and the Court takes no position on whether they conflict with federal regulations or violate any constitutional provisions.

against one of FreeEats' clients, Economic Freedom Fund, in Brown County, Indiana ("the state action").   FreeEats' Prelim. Inj. Exhs. D-E; *Decl. of Marguerite M. Sweeney*, Attachs. 1-2. Economic Freedom Fund hired FreeEats to make calls to Indiana residents and play prerecorded messages, and FreeEats began making those calls in or about September of 2006 from its call center in Virginia to Indiana residents in support of Congressional candidates for the November 2006 election. *Decl. of Gabriel S. Joseph, III*, ¶¶ 6, 9-10.   The State's initial Complaint did not name FreeEats but indicated that several "John Does" were involved in the case and responsible for violating the ADMS.  FreeEats' Prelim. Inj. Exh. D; *Decl. of Marguerite M. Sweeney*, Attach. 1.  On September 22, 2006, the day after FreeEats filed its lawsuit in this Court, the State moved to amend its Complaint to include FreeEats in the state action.   FreeEats' Prelim. Inj. Exh. E; *Decl. of Marguerite M. Sweeney*, Attach. 2.

FreeEats claims that the ADMS is preempted by federal law, creates an undue burden on interstate commerce and violates the First Amendment and the free speech provision of the Indiana Constitution, Article 1, Section 9. *Compl.*, ¶¶ 21-39.  FreeEats also raises a claim under 42 U.S.C. § 1983. *Compl.*, ¶¶ 40-43.  FreeEats estimates that if it is required to use live operators in order to comply with the ADMS it will take at least thirty-five days to make all of its intended calls to Indiana residents. *Second Decl. of Gabriel S. Joseph, III*, ¶ 9.  FreeEats asserts that if it is permitted to use its automated system, it can make all of the calls in seven hours. *Second Decl. of Gabriel S. Joseph, III*, ¶ 9.  FreeEats also estimates that in order to comply with the ADMS, FreeEats might have to spend as much as $2,250,000.00 to employ live operators and equipment.   *Second Decl. of Gabriel S. Joseph, III*, ¶ 8.  According to FreeEats, this translates into an increase from $0.15 per call to $2.25 per call made, or 1500%.   *Second Decl. of Gabriel S. Joseph, III*, ¶ 8.

Since this lawsuit was filed, Economic Freedom Fund agreed in the state action to be bound by a preliminary injunction. FreeEats' Prelim. Inj. Exh. E. While at first blush this might appear to moot the issues in this case, FreeEats alleges that it has other clients who have expressed an interest in making calls to Indiana residents but who are unwilling to do so in light of the State's threatened and current enforcement of the ADMS. *Third Decl. of Gabriel S. Joseph, III*, ¶ 3.[3]

## III. DISCUSSION

### A. THE STATE'S MOTION TO STAY AND MOTION TO DISMISS

The State moved to stay the proceedings in this case until the Court ruled on the State's Motion to Dismiss. The State contends that in light of the pending state action in Brown County, this Court should abstain from ruling on this case pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), and dismiss this matter. For the reasons expressed below, the Court concludes that a stay and dismissal based on abstention principles are inappropriate.

A federal court may properly abstain in a case if (1) there is an "ongoing state judicial proceeding;" (2) the state has a legitimate, substantial interest in the pending state proceedings; (3) the party seeking federal review has an adequate opportunity to raise its constitutional claims in the state proceeding; and (4) the state law being challenged is not "flagrantly and patently violative of express constitutional provisions." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). As the Supreme Court has cautioned, however, abstention analysis should be "heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem. Hosp. v. Mercury*

---

[3] The Court also notes that any potential mootness concerns would be inappropriate to stall resolution of this matter because the circumstances of the case are capable of repetition and of evading review. *See Majors v. Abell*, 317 F.3d 719, 722-23 (7th Cir. 2003).

*Constr. Corp.*, 460 U.S. 1, 16 (1983). Indeed, federal courts have a "virtually unflagging obligation" to exercise properly conferred jurisdiction. *New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 358-59 (1989). As the Seventh Circuit has explained, "[j]urisdiction, if properly conferred, is meant to be exercised." *Prop. & Cas. Ins. v. Cent. Nat'l Ins.*, 936 F.2d 319, 320-21 (7th Cir. 1991). Thus, "*Younger* abstention is appropriate only when resolution of the federal defenses belongs in the State forum." *Greening v. Moran*, 953 F.2d 301, 304 (7th cir. 1992), *cert. denied*, 506 U.S. 824 (1992).

The Court concludes that abstention is inappropriate because this case involves important federal issues that require urgent attention. First, while FreeEats is paid to survey the public and deliver the political messages of others, the parties are in apparent agreement that FreeEats' activities involve political speech. In addition, FreeEats challenges the application of the ADMS to its speech on grounds of federal preemption and violations of the Commerce Clause and First Amendment. The Court also notes that the state action is in its infant stages, and therefore the Court's resolution of this cause will not unduly affect the state action. Finally, while FreeEats could no doubt raise its objections to the enforcement of the ADMS in the state action, it is highly probable that the state court will be unable to quickly resolve this dispute in the near future. While the Court does not doubt the ability of the state court to fairly consider and adjudicate FreeEats' claims,[4] the delays that have taken place in that matter to date make it unlikely that the state court will be able to address those claims prior to the general election, which is just weeks away. The Court believes that all of these circumstances compel adjudication of this matter rather than abstention.

---

[4] The Court does not share FreeEats' belief that the state court has somehow prejudged this matter.

The Court's decision is based on these extraordinary circumstances.  The Court is not swayed by the arguments from the parties as to whether this cause or the state action was filed first, nor is the Court swayed by suggestions that the delay in the state action is the fault of the parties.  While the Court recognizes that part of the delay could conceivably be the result of gamesmanship, the Court disagrees with the notion implied by the State that Economic Freedom Funds' request for a change of judge was inappropriate, particularly when the parties were given advance notice in the Order of Recusal that the magistrate judge would be appointed pursuant to the local rules unless the parties were able to reach an agreement on the selection of a special judge.[5]  *See* FreeEats' Prelim. Inj. Exh. G.

The Court is also not persuaded by "second bite" arguments both parties have made based on *Midwestern Gas Transmission Co. v. McCarty*, 270 F.3d 536 (7th Cir. 2001).  Despite the State's insistence to the contrary, the Court is reluctant to conclude that FreeEats is attempting to "split" the federal and state proceedings and somehow undermine the state action.  FreeEats has understandable reasons for being concerned that the state court may be unable to resolve the dispute over its claims prior to the general election.  The Court is likewise unwilling to agree with FreeEats argument in its Response to the State's Second Submission of Evidence that the State should somehow be barred from trying to uphold the validity of the ADMS because the Attorney General availed himself of the opportunity to submit comments in response to the FCC's 2002 notice of proposed rulemaking regarding the TCPA.  FreeEats fails to cite to any case that would treat a party's participation in a

---

[5]  The Order of Recusal gave the parties seven days from the date of the order to reach an agreement.  The Court notes that the Order of Recusal was signed on September 26, 2006, so the parties had until October 3, 2006, to file an agreement, the same day that Economic Freedom moved for a change of judge.  *See* FreeEats' Prelim. Inj. Exh. G; *Second Decl. of Marguerite M. Sweeney*, Exhs. A-B.

rulemaking process via public comment the same as the circumstances in *Midwestern Gas* where a party had the opportunity to litigate its interests in an administrative proceeding.

The Court does not doubt that the State has an interest in enforcing its statutes, including the ADMS.  Indeed, Congress recognized the State's interest in the TCPA.  *See* 47 U.S.C. § 227(f)(6).  However, given the circumstances of this case and in light of the Supreme Court's statement that abstention analysis should be weighted in favor of exercising jurisdiction, *see Moses H. Cone Mem. Hosp.*, 460 U.S. at 16, the Court concludes that abstention is inappropriate in this case.  Therefore, for the foregoing reasons, the State's Motion to Stay and Motion to Dismiss are both **DENIED**.


### B.  FREEEATS' MOTION FOR PRELIMINARY INJUNCTION

FreeEats' argues in its Motion for Preliminary Injunction that an injunction is appropriate because it is likely to prevail on its preemption, Commerce Clause, and First Amendment claims.

The Court notes that FreeEats' request for preliminary injunction is intertwined with whether it is likely to prevail on its request for declaratory relief.  In general, declaratory judgment actions are justiciable if "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  A litigant must show an injury that is "real, not imaginary; concrete, not abstract; apparent, not illusory; and demonstrable, not speculative." *J.N.S., Inc. v. Indiana*, 712 F.2d 303, 305 (7th Cir.1983) (quoting *Myron v. Chicoine*, 678 F.2d 727, 730 (7th Cir.1982)).

A preliminary injunction is an extraordinary remedy that will only issue on a clear showing of need.  *See Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (citing *Mazurek v. Armstrong*,

520 U.S. 968, 972 (1997)).  The movant bears the burden of proving its entitlement to such relief. *Id.*  In order to obtain a preliminary injunction, FreeEats must show that show a likelihood of success on the merits, irreparable harm if the injunction is denied, and the inadequacy of any remedy at law. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 896 (7th Cir. 2001).[6]  If FreeEats makes this threshold showing, then the Court must balance the hardship on FreeEats if the injunction is wrongfully denied against the hardship on the defendants if it is wrongfully granted, and the Court must consider the impact of the injunction on the public interest.  *See Ferrell v. United States Dep't of Housing & Urban Dev.*, 186 F.3d 805, 811 (7th Cir. 1999).  The Court must "balance the harms to both parties using a 'sliding scale' analysis:  the greater the moving party's likelihood of prevailing on the merits, the less strongly it must show that the balance of harms weighs in its favor." *Id.* (citing *Allied Signal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573-74 (7th Cir. 1999); *Roth v. Luthern Gen. Hosp.*, 57 F.3d 1446, 1453 (7th Cir. 1995); *Storck U.S.A., L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994)).

With these principles the mind, the Court will address FreeEats' request for a preliminary injunction as it pertains to its preemption, Commerce Clause, and First Amendment claims.

---

[6]  The Court recognizes that the issuance of a declaratory judgment is not necessarily precluded should FreeEats fail to demonstrate all of the traditional equitable prerequisites for an injunction.  *See Steffel v. Thompson*, 415 U.S. 452, 471-72 (1974).

## 1. FreeEats' Preemption Claim

This case involves a situation where a state regulation is more restrictive than its federal counterpart by prohibiting activity, *i.e.*, the use of automated dialing machines, that the federal agency rules permit as an exception to the federal statute.  FreeEats claims that the state statute must be stricken because it conflicts with the federal agency rules and is preempted by federal law.

While this question appears to be one of first impression in this district, at least two other federal courts and several state courts have addressed it.  *See*, *e.g.*, *Van Bergen v. Minnesota*, 59 F.3d 1541 (8ᵗʰ Cir. 1995); *Chamber of Commerce v. Lockyer*, No. 2:05-cv-2257 MCEKJM, 2006 WL 462482 (E.D. Cal. Feb. 27, 2006); *Stenehjem v. FreeEats.com, Inc.*, 712 N.W.2d 828 (N.D. 2006), *cert. denied*, 549 U.S. ---, 2006 WL 2094472 (Oct. 10, 2006); *Utah Div. of Consumer Prot. v. Flagship Capital*, 125 P.3d 894 (Utah 2005); *Charvat v. Telelytics, LLC*, No. 05AP-1279, 2006 WL 2574019 (Ohio Ct. App. Aug. 31, 2006).  These cases provide some guidance for addressing the issue of preemption.

There is a general presumption that Congress did not intend to preempt and displace state laws because "Congress does not cavalierly pre-empt" state law.  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  However, where the state laws in question bear upon national interests over which Congress has asserted a significant federal presence, the presumption does not apply.  *See United States v. Locke*, 529 U.S. 89, 108 (2000); *Lockyer*, 2006 WL 462482, *6-7.  The court in *Lockyer* found that the presumption did not apply because there had been "a tremendous amount of federal legislation regarding interstate telecommunications."  *Lockyer*, 2006 WL 462482,  *6.  This Court respectfully disagrees with *Lockyer's* conclusion because it ignores that the States have for several years attempted to regulate telecommunications that harm state citizens, a fact that Congress

11

acknowledged when it passed the TCPA.  Therefore, the Court does not find a compelling justification for departing from the general presumption.

The Court must next determine whether the state law is preempted under either of the two basic types of preemption: express and implied.  *See English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).  Express preemption, also know as "complete preemption," exists where a federal statute states an intent to preempt state law.  *Id.*  A prime example of this type of preemption can be found in the provisions of the Employment Retirement Insurance Security Act.  *See* 29 U.S.C. § 1144(a). In this case, the Court finds no language in either the FCA or the TCPA that indicates that any inconsistent state laws are superceded or preempted.  To the contrary, Congress went to some lengths to preserve the States' ability to regulate in this area.  *See*, *e.g.*, 47 U.S.C. § 227(e)(1)(B) ("savings clause" preserving ability of States to impose more restrictive intrastate requirements or regulations on automatic dialing systems or to prohibit the same)[7]; *id.* § 227(f)(6) (preserving right to proceed in state courts for alleged violations of state civil or criminal statutes); *id.* § 253(b) (preserving ability to act to protect safety and welfare and safeguard consumer rights).  Based on the absence of any language to the contrary and in light of the recognition of the States' ability to enact regulations in this area, the Court concludes that the ADMS is not expressly preempted.

In contrast to express preemption, implied preemption occurs when a federal statute implicitly overrides state law either when the scope of the statute indicates that Congress intends for federal law to exclusively occupy a field or when the state law is in actual conflict with federal law. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).  These two types of implied preemption

---

[7]  Interestingly, the analysis of this subsection in the Senate Report makes no reference to or distinction between intrastate or interstate regulations.  *See* S. Rep. No. 102-178, reprinted in 1991 U.S.C.C.A. at 1978.

are known as "field preemption" and "conflict preemption" respectively.

The Court finds that there is no field preemption in this case. The preemption provision in this case, 47 U.S.C. § 227, makes it clear that Congress did not intend to "occupy" the field of regulating automatic dialing machines. *See Van Bergen*, 59 F.3d at 1548. This section clearly expresses the intent of Congress that the TCPA was not intended to preempt all state law affecting the same subject. This conclusion is supported by the legislative history on the section. Congress explicitly recognized that over half of the States had regulations restricting various uses of telephones for marketing but that telemarketers were evading review through interstate operation. *See* Pub. L. No. 102-243, § 2(7), 105 Stat. at 2394; S. Rep. No. 102-178, 1991 U.S.C.C.A.N. at 1970. Congress indicated that the federal regulations were the "minimum necessary to protect the public against the harm caused by" automated dialing machines. S. Rep. No. 102-178, 1991 U.S.C.C.A.N. at 1973. While Congress did note that part of the problem was that States did not have jurisdiction over interstate communications, it did not overrule State regulations that had the potential to differ from federal law and it provided a section permitting States to impose more restrictive measures. *Id.* at 1970, 1978. Indeed, the Third Circuit has concluded that the TCPA does not reflect an attempt to occupy the field of interstate communications or to promote national uniformity of regulation. *See Erienet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513, 515 (3rd Cir. 1998). Based on the final provisions of the TCPA and the legislative history, the Court concludes that field preemption does not apply.

Finally, the Court turns to conflict preemption. Conflict preemption may be found "where it is impossible for a private party to comply with both state and federal requirements, or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives

of Congress.'" *English*, 496 U.S. at 79.  Conflict preemption appears to be the key to determining whether the ADMS is preempted because other courts that have addressed similar issues have resolved those cases on this basis.  *See*, *e.g.*, *Van Bergen*, 59 F.3d at 1548; *Stenehjem*, 712 N.W.2d at 839-41.  *Cf. Lockyer*, 2006 WL 462482, *8.

The Court concludes that conflict preemption does not apply.  Turning to the plan language of the savings provision and the legislative history of the TCPA, the Court finds that the TCPA creates a uniform nationwide minimum while permitting the States, who were closer to their citizens and can better grasp whether the exercise of police power is necessary to protect their citizens' needs, to pass more restrictive measures if necessary.  *See* 47 U.S.C. § 227(e)(1); S. Rep. No. 102-178, 1991 U.S.C.C.A.N. at 1970, 1973, 1978; Rules and Regulations Implementing the Tel. Consumer Protection Act of 1991, Rep. and Order, 18 FCC Rcd. 14014 (2003), ¶ 81.[8]  Coupled with Congress' recognition that telemarketers were evading state regulation via interstate operation, the Court agrees with *Van Bergen* that the TCPA was intended "to provide interstitial law preventing evasion of state law by calling across state lines."  *Van Bergen*, 59 F.3d at 1548.

Having so interpreted the TCPA, the Court concludes that entities like FreeEats can satisfy both federal and state law.  This is not a case where federal regulations forbid activity or place restraints and the State is attempting to prescribe the manner of doing something differently such that the statute's objectives cannot be achieved.  This is a case where the State has chosen to prohibit

---

[8]  The Court also notes that the savings provision includes a comma and the disjunctive "or" between the phrases "impose more restrictive intrastate requirements or regulations" and "which prohibit."  47 U.S.C. § 227(e)(1).  The Court agrees with the discussion in *Stenehjem* that the placement of the comma and use of the disjunctive are significant and reveal an intent that States be granted more leeway to impose more stringent regulations on activity that targets their citizens.  *See Stenehjem*, 712 N.W.2d at 834.

14

activity that is not regulated because of an exception. Companies like FreeEats who wish to make calls can readily identify which of its calls are being placed into Indiana and choose not to make those calls or conform to the ADMS.

Moreover, the Court concludes that a finding of preemption would subvert the purpose of the TCPA. Congress' intent for the TCPA was to help combat the problem of interstate telemarketers who were evading review; however, prohibiting a state from enforcing its laws against interstate callers nullifies both that state's laws and Congress' intended solution to the problem. If a state's laws have no teeth against an out-of-state caller, telemarketer would need only locate their offices outside of Indiana in order to make their disruptive calls. This result would be inconsistent with the TCPA's attempts to preserve the States' ability to regulate telecommunications for the welfare of their citizens. *See* 47 U.S.C. § 227(f)(6); 227 U.S.C. § 253(b). It would also make no sense in light of both parties' recognition that States can regulate obscene and harassing phone calls. Indeed, if the States can regulate such calls that harm its citizens, there seems no reason why they cannot regulate calls that disrupt their citizens' interest in residential privacy.

Based on the a plain reading of the text of the federal provisions and their history, and in light of the Congressional intent expressed therein, the Court concludes that the ADMS is not preempted by federal law. Accordingly, FreeEats cannot demonstrate that it is likely to prevail on this claim.

## 2. **FreeEats' Commerce Clause Claim**

FreeEats also seeks a declaration that the ADMS violates the Commerce Clause because it "regulates interstate calls to residents of Indiana for political purposes." *Compl.*, ¶ 32.[9] Moreover, enforcement of the ADMS has the potential to disrupt FreeEats' objectives to poll residents and deliver political messages. *See Second Decl. of Gabriel S. Joseph, III,* ¶¶ 2-5, 11.

The State first questions whether this case even involves *interstate* commerce, much less commerce. The State makes a good point. It is not clear that the circumstances of this case present a Commerce Clause question. FreeEats' main purpose in conducting polls and delivering its messages is political rather than commercial. In addition, without ignoring the obvious, this case involves the specific targeting of Indiana residents regarding what in large part are issues for the upcoming general election for one of Indiana's Congressional districts. *See Second Decl. of Gabriel S. Joseph, III*, Exhs. 1-3. Further, a lack of commerce is underscored by FreeEats' argument that compliance with the ADMS would make campaigning more costly. FreeEats suggests that the same costs would affect its own interests, but this is insufficient to show a burden on commerce because it merely shows an effect on a particular firm rather than the market. *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127-28 (1978); *Philip Morris, Inc. v. Reilly*, 267 F.3d 45, 65 (1st Cir. 2001).

---

[9] The irony of FreeEats' claim is not lost on the Court. One of the reasons for passing the TCPA was the belief that regulating telemarketing calls and the use of automated devices was necessary to curb an impediment to interstate commerce. *See* S. Rep. 102-178, reprinted in 1991 U.S.C.C.A.N. at 1969, 1972-73. In fact, Congress noted that the use of automated devices was adding to the problem because such machines made calling more cost-effective. *Id.* at 1969.

Finally, FreeEats' does not contest that there is little doubt that the State can use long-arm jurisdiction to enforce violation of its civil and criminal laws when its citizens are affected.[10]

While there is much to be said for the State's argument, FreeEats counters that commerce is at issue because it pays for its telephone service and compliance with the ADMS would drive its costs up astronomically. The Court need not resolve this debate, however, because even assuming *arguendo* that the Commerce Clause is actually implicated, the Court concludes that FreeEats would be unable to demonstrate a likelihood of success on the merits of its claim.

There are two tests under the Supreme Court's Commerce Clause jurisprudence. The first rule, also known as the *per se* rule, is "applied when a statute 'directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests.' " *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003) (quoting *Brown-Forman Distillary Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1980)). Under the second rule, "if a statute is neutral on its face, has only indirect or incidental effects on interstate commerce, and regulates evenhandedly," then the statute is upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Gov't Suppliers Consol. Servs., Inc. v. Bayh*, 975 F.2d 1267, 1277 (7th Cir. 1992) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Here, FreeEats contends that the ADMS directly regulates commerce because it involves an instrumentality of commerce, the telephone system. But just because a regulation touches upon an instrumentality does not mean that the regulation is directly regulating commerce itself. In fact, the

---

[10]  The TCPA recognizes this ability, as does the FCC.  *See* 47 U.S.C. §§ 227(f)(6) and 253(b); Rules and Regulations Implementing the Tel. Consumer Protection Act of 1991, Rep. and Order, 18 FCC Rcd. 14014 (2003), ¶ 85.

ADMS is neutral on its face as it pertains to commerce. It is not the protectionist-type of restriction that is directed toward interstate commerce or that discriminates against interstate commerce. Instead, the thrust of the ADMS is to prevent automated calls with prerecorded messages, both interstate and intrastate, directed at Indiana residents from certain entities. Moreover, the statute makes no distinction that favors one state over another. It applies to everyone, and so conceivably the costs necessary for compliance with calls to Indiana residents apply to every entity, whether in Indiana or outside of Indiana. Finally, the ADMS is not determining rates or regulating telephone service, it simply regulates the manner in which callers place calls to Indiana residents. Therefore, the Court finds that the ADMS does not run afoul of the *per se* test.

However, the Court cannot ignore the fact that the ADMS does have some effect on entities like FreeEats, who estimates that compliance with the statute will result in a 1500% increase in the cost of making calls. Because there is an indirect effect, the issue on the Commerce Clause must be resolved using the *Pike* balancing test. Because the determination of whether a regulation burdens interstate commerce is a question of law, the Court must resolve this issue. *See Di Santo v. Pennsylvania*, 273 U.S. 34, 41 (1927) (Brandeis, J., dissenting); *Farmers' Grain Co. of Embden v. Langer*, 273 F. 635, (8th Cir. 1921); *Stone v. CSX Transp., Inc.*, 37 F. Supp.2d 789, 797 (S.D. W.Va. 1999). In doing so, the Court recognizes that its role is limited and that it should not "second- guess the empirical judgments of lawmakers concerning the utility of legislation." *Gov't Suppliers Consol. Servs., Inc.*, 975 F.2d at 1285 (citations omitted).

The Court concludes that the balance weighs in favor of the State. As discussed below regarding the First Amendment claim, the State has a strong interest in protecting residential privacy. *See Frisby v. Schultz*, 487 U.S. 474, 484 (1988). Further, the ADMS does not completely ban the

18

use of prerecorded messages because a caller need only use a live operator to obtain the recipient's consent prior to playing the prerecorded message. In contrast, FreeEats notes the potential cost of compliance. However, as already noted, this is insufficient to raise a Commerce Clause issue. *See Exxon Corp.*, 437 U.S. at 127-28; *Philip Morris, Inc.*, 267 F.3d at 65. Likewise, a showing that the statute may affect the way that FreeEats conducts its business is insufficient to prevail on a Commerce Clause claim. *See Eby-Brown Co., LLC v. Wis. Dep't of Agric.*, 295 F.3d 749, 756-57 (7th Cir. 2002). Therefore, the Court concludes that any burden on interstate commerce that may result from the ADMS is not clearly excessive in relation to the putative local benefit of protecting residential privacy. Accordingly, the Court finds that FreeEats cannot demonstrate that it is likely to prevail on the merits of its Commerce Clause claim.

### 3. <u>FreeEats' First Amendment Claim</u>

FreeEats contends that the ADMS violates the freedom of speech provision of the First Amendment. The parties do not dispute that FreeEats' speech is political in nature, and based on this characterization of its speech FreeEats suggests that the ADMS cannot pass constitutional muster under the stringent degree of scrutiny applied to restrictions on political speech.

Contrary to FreeEats' suggestion, the Court finds that the proper analysis for discussing FreeEats' First Amendment claim is that employed by the Eighth Circuit in *Van Bergen*.[11] The Eighth Circuit thoroughly reviewed the First Amendment issue in the context of restrictions on

---

[11] The Ninth Circuit employed a similar analysis in *Bland v. Fessler*, 88 F.3d 729, 733-39 (9th Cir. 1996).

automated dialing machines.[12]  This Court believes that a similar analysis is required for reviewing Indiana's statute.

As the Supreme Court has provided, States "may impose reasonable restrictions on the time, place or manner of engaging in protected speech provided that they are adequately justified 'without reference to the content of the speech.' " *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). In this case, the Court finds that the ADMS is content-neutral.  There is nothing in the statute that suggests it is meant to apply to speech on the basis of the speech's content.  With a few exceptions listed in subsection (a) of the ADMS, the restrictions in the statute apply to all calls regardless of content.  However, the Court concludes that these limited exceptions do not make the ADMS invalid.  This is because the exempted groups are excluded not on the basis of the content of their message but on the basis of their relationship with the recipient of the call.  *See Van Bergen*, 59 F.3d at 1550-51.  The statute is therefore similar to other valid restrictions that regulate the manner or means of speech.  *See*, *e.g.*, *Kovacs v. Cooper*, 336 U.S. 77, 87-89 (1949) (plurality opinion) (regulation of sound trucks); *Ward*, 491 U.S. at 800-03 (regulation of public address system).

The Court further agrees with the discussion in *Van Bergen* that traditional forum analysis is inapplicable in this case.  The parties have made no showing that the telephone system is a part of the public forum, either by tradition or by government designation.  Moreover, like the Eighth Circuit, this Court finds that the nonpublic forum standards are inapplicable.  Although it is regulated by the government, the telephone system is not created, owned, or operated by the government but by private entities.  As the Eighth Circuit noted, the Supreme Court has not extended the nonpublic

---

[12]  Again, though the organization is somewhat different, the Minnesota statutory scheme is strikingly similar to the one in Indiana.  Minn. Stat. § 325E.27.

forum analysis to these circumstances. *See Van Bergen*, 59 F.3d at 1552 & n. 9 (discussing *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994), which applied the "intermediate level of scrutiny" to content-neutral restrictions that imposed an incidental burden on speech in the context of cable television systems). Accordingly, because the ADMS is content-neutral, the Court finds that the statute should be examined under the standards for time, manner, and place restrictions.

The appropriate test then for determining whether the ADMS is valid is whether the statute is narrowly tailored to serve significant governmental interest while leaving open ample alternative channels for communication. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968). The Court finds that the ADMS passes this test and is therefore not invalid under the First Amendment. The government interest served by the statute is the protection and preservation of residential privacy. As the Supreme Court has recognized, this interest is "of the highest order." *Frisby*, 487 U.S. at 484 (quoting *Carey v. Brown*, 447 U.S. 455, 471 (1980)). The harm generated by automated calls directly impacts this interest. Contrary to FreeEats' suggestion, the harm is more than the simple ringing of the telephone.[13] A call recipient cannot interrupt a prerecorded message and request not to be contacted, and if the individual does not answer the telephone or hangs up he or she runs the risk of additional calls in the future. Indeed, in enacting the TCPA, Congress determined that automated calls are more of a nuisance and a greater invasion of privacy than a live operator. *See* S. Rep. No. 102-178, reprinted in 1991 U.S.C.C.A.N. at 1972. Further, an automated message runs

---

[13] FreeEats' argument on this point is somewhat curious given that its President indicated that FreeEats' automated system will often call a number up to three times in order to get a live answer. *See Second Decl. of Gabriel S. Joseph, III*, ¶ 13. Thus, rather than a single impact on a home, FreeEats' has the potential outcome of affecting the 1,700,000-identified and intended recipients up to three times each. The potential impact on residential privacy is therefore hardly minimal.

the risk of turning a listener into a "captive audience" incapable of declining the interruption of automated calls in their daily lives. *Accord Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) (Douglas, J., concurring); *Humphrey v. Casino Mkting Group, Inc.*, 491 N.W.2d 882 (Minn. 1992). Thus, the State's interest in this case is significant.

The statute is narrowly tailored to achieve the interest of protecting residential privacy. The statute protects and promotes privacy while not completely banning calls or foreclosing the ability of companies like FreeEats from still using prerecorded messages should they obtain prior consent to play the message. The statute also empowers the homeowner to choose what messages are unwanted by giving them the opportunity to decline to listen to a message at any time and the ability to request not to be called again, both without having to completely prevent all such calls.

Finally, the Court finds that the statute leaves open ample alternative forms of communication. First, the statute does not ban companies from calling Indiana residents. Moreover, the statute leaves room for other forms of political speech such as door-to-door campaigning, bulk mailings, leafleting and use of posters and signs to name a few examples. For all of these reasons, the Court concludes that the ADMS, like the statute in *Van Bergen*, is a reasonable time, place, or manner restriction on speech. *See also Humphrey*, 491 N.W.2d at 892 (reaching similar conclusion on Minnesota statute as applied to commercial speech).[14]

Perhaps anticipating the Court's conclusion, FreeEats attempted at the evidentiary hearing to distinguish *Van Bergen* by citing to *Meyer v. Grant*, 486 U.S. 414 (1988), and *City of Ladue v.*

_____

[14]   The Court notes that the test for time, place, and manner restrictions is similar to the test articulated in *Central Hudson Gas & Electric Corporation v. Public Service Commission*, 447 U.S. 557 (1980), for considering commercial speech regulations. *See Bd. of Trustees v. Fox*, 492 U.S. 469, 477 (1989).

*Gilleo*, 512 U.S. 43 (1994), and by arguing that compliance with the statute would be costly and make reaching all of the intended call-recipients more difficult. The Court finds FreeEats' arguments unpersuasive. First, FreeEats' argument is based on the faulty presumption that the ADMS eliminates or bans its speech. This argument sweeps too broadly. Nothing in the ADMS prohibits FreeEats from delivering its message, rather, the ADMS merely regulates the means or manner in which FreeEats' delivers its message by prohibiting FreeEats from using a machine to contact Indiana residents. FreeEats remains free to use the telephone to contact Indiana residents via a live operator to obtain consent before playing a prerecorded message.

Second, the circumstances in both *Meyer* and *City of Ladue* are distinct and inapposite. In both cases, the government regulation almost completely eliminated a form of speaking. In *Meyer*, the regulation prohibited using paid individuals to circulate initiative petitions, which infringed on the ability to participate in the process of debating and the ability of citizens or groups to seek redress. The regulation was also aimed exclusively at political speech. In *City of Ladue*, the regulation prohibited the use of signs on residential property. The regulation provided for several exceptions, which the Supreme Court concluded were based on the signs' message. Because FreeEats remains free to use the telephone to contact residents, not to mention the various alternatives already noted, the concerns in *Meyer* and *City of Ladue* are not present in this case. Finally, FreeEats' concerns regarding compliance costs are irrelevant. The Supreme Court has clearly stated that the fact that "more people may be more easily and cheaply reached" by a method of speech is not the test. *Kovacs*, 336 U.S. at 88-89. The Court therefore rejects FreeEats' arguments as to why *Van Bergen* is not persuasive authority on the First Amendment claim.

23

For all of the foregoing reasons, the Court concludes that the ADMS does not violate the First Amendment.  Therefore, FreeEats cannot prevail on this claim.

### 4.  <u>Summary</u>

The Court finds that FreeEats has not demonstrated that is likely to succeed on the merits of any of its claims.  Because the Court concludes that FreeEats cannot make the requisite showing on this factor, the Court need not discuss the other factors for a preliminary injunction because a party must satisfy all three threshold requirements before a Court will balance the interests of the parties and weigh the impact on public interest.  *See Cooper*, 196 F.3d at 813.  FreeEats' request for a preliminary junction must be **DENIED**.

### IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court **DENIES** Defendants', State of Indiana ex rel. Steve Carter, Attorney General and Steve Carter, Attorney General, Motion to Stay and **DENIES** Defendants' Motion to Dismiss.

In addition, the Court **DENIES** Plaintiff's, FreeEats.com, Inc., Motion for Preliminary Injunction.

IT IS SO ORDERED this 24th day of October, 2006.

LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

24

**Distributed electronically to:**

John R. Maley
BARNES & THORNBURG
jmaley@btlaw.com

Paul L. Jefferson
BARNES & THORNBURG LLP
pjefferson@btlaw.com

Emilio W. Cividanes
VENABLE LLP
ecividanes@venable.com

John F. Cooney
VENABLE LLP
jfcooney@venable.com

Ronald Michael Jacobs
VENABLE LLP
rmjacobs@venable.com

Thomas M. Fisher
OFFICE OF INDIANA ATTORNEY GENERAL
Tom.Fisher@atg.in.gov

Julie Annette Hoffman
OFFICE OF INDIANA ATTORNEY GENERAL
julie.hoffman@atg.in.gov